Our next case, second case today, No. 23-2108, USA Farm Labor v. Secretary Su and Mr. Hall. Good to have you with us, Mr. Hall. Good morning, Your Honors, and may it please the Court. My name is Wendell Hall. I represent the plaintiff appellants in the appeal of the denial of their motion for a preliminary injunction against the Department of Labor's rule setting the minimum wages for H-2A agricultural guest workers. The final rule is unlawful for two independent reasons. The first reason it's unlawful is because it failed the Supreme Court's state farm test. Is that an issue that you're raising here, that it's unlawful? Yes, it is. I thought you were feeling the denial of an injunction. Yes. Well, it has to be – it's a likelihood issue, a legal issue, isn't it? Oh, most – yes, Your Honor. Well, it's a likelihood of success on the merits. The judge denied the injunction because it said it didn't satisfy the standards, and that's what you're appealing, is the denial of a preliminary injunction. That is correct, Your Honor. And Judge Ridinger, he wrote an opinion on it. Yes, Your Honor. A year or so ago. Yes. We do not have the – The case has changed, and you're all still litigating. Yes. The case is – And you've got a motion to amend your complaint pending. No. We finalized the motion for – the briefing on the motion for summary judgment, and we're waiting for action on that. I thought there was a motion – was it – that you're on the third amended complaint. Yes. Or second amended complaint. Yes. I believe – what we did – The third complaint, the second amended complaint. Has that been filed? Or is it pending? It's pending. I believe it's been filed.  I believe it's been filed. Well, I've got a copy of it. Well, then – But it says on it – it calls it – anyway. I stand corrected, Your Honor. There's stuff going on in the district court that's not in this record because you're appealing a denial of a preliminary injunction, and you've changed the complaint. So the injunction ruling doesn't even deal with what you're proposing to the court now. No. The district court. Same district court. Same judge. That is incorrect, Your Honor.  So how is this thing even viable? What we did is we added plaintiffs, and what we did is we focused with respect to the issues. We're presenting to this court whether the government consider all relevant aspects, all important aspects of the problem before it has been litigated several times – in every single pleading that we filed before the district court. The second issue, whether the government properly considered financial cost, has been considered in every pleading before the district court. It's been ruled on. Both issues have been ruled on. We have raised the same issues repeatedly in order to ensure that everything – Are these things that were raised after the denial of the preliminary injunction or before the denial of the preliminary injunction? Before. Every single one was before. Okay. But what – and what about all those things that were raised after the denial of the preliminary injunction? What we did after the denial of the preliminary injunction was we – the government argued, again, waiver. You waived this. You didn't bring this in. So what we did is we clarified the complaint to make it very clear and make it unquestionably clear that, in fact, those – So you amended the complaint. Right. You agree you amended the complaint. Right. And you had some different claims. No. What we did is we clarified the claims to deal with the government's argument. What we did is we showed that throughout the pleadings, throughout every document that we filed, we established that we had made these arguments. We've been saying that the government had to consider the effects of illegal immigration in every single pleading that we filed in this case. And what we received was an argument that, well, no, you waived it because you didn't say it precisely. You didn't say it clearly enough. So what we did is we said it clearly enough. Government wants a new pleading saying it clearly enough. It's clear. Now you raised the cause of action that the final rule was not approved by the attorney general after consultation with the secretary of labor and secretary of agriculture. Right. Isn't that a new cause of action? That is. That is a new cause of action. So you're litigating a different case than is pending here. Well, these particular issues were brought and presented to this court over which this court accepted the appeal and asked jurisdiction. With respect to the fact that the attorney general required statutorily to approve this and did not, no, that was raised because the government said you waived that and you can't do that. But that's a new issue that you've raised since you're writing the rule. Right. But it doesn't affect, we would argue, the fact that. There have to be arguments. Right. Exactly. Otherwise you're moot. Exactly. So the question is why aren't you moot? We're not moot because these issues are live issues. They're raised. They've been raised in every single pleading. They're not moot because this particular procedure. But you're trying to litigate a different case. Well, we are litigating the same, fundamentally a case is this. If we go back to the old, you know, mine workers versus Gibbs. We have raised a separate, a new issue in the same case. These issues were presented to this court and we briefed them and this court has been proceeding with respect to those issues. It has been, it is live. It is moving. It's obviously we're here to discuss those issues. The later injection of this other issue does not change the fact that this court has exercised jurisdiction and has exercised its review authority as to whether or not the preliminary injunction was properly granted. Well, you can appeal a denial of a preliminary injunction. Right. There's no question about that. We have jurisdiction for that. But what you're asking us to review is different than what you're litigating now. That's my point. And to highlight that in the impact, you say it doesn't. I would say it doesn't because the issues are precise. The issues are the ones that Judge Ridinger decided, made his decision on. It is not a question of sandbagging the district judge or bringing something to your honors that we didn't ask the district judge to rule on. He ruled on everything. Everything was presented to him and he ruled. We argued it, both of us, both sides argued it very vigorously, and we presented it to this court. So the issues, there are two issues here. Issue number one is whether or not the agency considered every important aspect of the problem before it. That is a fundamental requirement from the Supreme Court's State Farm decision, which almost all of modern administrative law goes back to. So what was here, though, we review for what we call abuse of discretion. Right. Yes. And this Court's cases define abuse of discretion in two ways. With respect to factual issues, it's clear error. But with respect to legal issues and understanding and applying the law correctly, it's de novo. Sometimes the Court describes it as misapprehending the law. Sometimes it describes it as pure error. Bottom line is the Court uses the word, in all the cases, use the words abuse of discretion, but it's defined as illegal error. And it goes back to what your honor said because your honor pointed out that all we have to do is show likelihood of success on the merits. No, that's not all you have to do. Well, we have three other elements. Four prongs. Yes, your honor. In the Winner case, four prongs. Yes. That's one of them. Right. And that's been the fundamental one that we've all focused on because in Winner, the last two, the public interest and the equities merge because it's obviously not in the public interest for an agency of the United States government acting unlawfully. With respect to irreparable injury, there's been no appeal on that issue because the judge decided that we lost on that only because we lost on the likelihood of success on the merits. And we briefly briefed that in our opening brief. So likelihood of success on the merits. That's been the focus of our efforts on it. Number one, the agency is required to review every single relevant aspect of the problem. That's what the Supreme Court says. One of those relevant aspects, when you're setting a minimum wage for agriculture, is whether or not it will have effects on legal immigration. We commented on that. Other commenters commented on that. We provided data that it would have an effect. And then the Department of Labor, unlike what it's done. Well, let me ask you. Section 1188, the section that you're here on, does not mention, even though the title does, it does not mention illegal immigration. It talks about the depression of wages, domestic wages. I'm curious. Why should DOL have considered illegal immigration? Well, the answer to that comes from the Department of Labor itself. In 2020, the Department of Labor issued another final rule that eventually actually ended up being this rule. And the Department of Labor's position then was straightforward. In setting the AWER, the department must balance the interests of workers and employers. Setting AWERS that are too high in any given area will harm U.S. workers indirectly by providing an incentive for employers to hire undocumented workers. So what happens is, if you drive people out of the H-2A program, they don't go and hire domestic workers because there aren't enough domestic workers. And that's documented in the record on JA 189, our expert's report. What they do is they go find people who are unauthorized. And that has an effect, the current studies show, that has a depressive effect on U.S. workers' wages. So the Department of Labor needs to carefully balance these considerations. Because if you go too far in one direction, it's like robbing Peter to pay Paul. You really don't have any benefit. All you do is replace legal H-2A workers who have protections, who have the Department of Labor to investigate with unauthorized workers. And Congress did not want that. But you would agree that the section, only the concern, the purpose of that section, deals with the depression of wages, domestic wages? It doesn't discuss illegal immigration at all? It does not use the term specifically. But I would respectfully disagree with the premise of the question. Because everything in IRCA, all seven titles, deals with reducing illegal immigration, in particular the employment of people who are unauthorized. Title I was control of unauthorized aliens. Title II was legalization. And why did Congress want to legalize the workers? Partly humanitarian reasons, but partly because they could participate in the workforce on an equal basis, lifting everybody's wages. Title III is the one we're dealing with, Section 1188. You're right. It doesn't use those terms. But by opening, creating an expanded H-2A program, it allowed agriculture to hire people legally, eliminating the jobs magnet, which is the term they all use. So if there aren't jobs to be had, then people won't come, was the idea. And then Title IV's reports, Title V and VI-VII deal with other issues. But they all relate to controlling and reducing illegal immigration. Mr. Hall? Yes, ma'am. Can we, in your time, turn to the accuracy of the cost estimate issue? Yeah. So I want you to address the facts that are put forward in the Farmworker Justice Amicus Brief that says as of about a year ago, July 26, 2023, 96.7% of H-2A workers with AEWRs calculated under the final rule were assigned based on the field and livestock workers category. So that's only about 1% lower than what the DOL estimated, and you say that the DOL estimate was arbitrary. So what's changed in the last year that we should be relying on to find that the DOL estimate was arbitrary? What we should be relying on is the Department of Labor's own expertise. In footnote 95 of the preamble, the Department of Labor says, if you want to figure out the cost, and if you want to figure out how many applications are going to change, you need to look at individual applications. It says that. That's the Department's own expertise. Then we get to the data set, and the Department says, we're not going to look at it. With respect to the experience under the new rule, it's varied. For instance, my client, USA Farm Labor, and I represent his office with the court, has found almost 5% of its classifications have changed. It's finding that employers are changing how they're doing business more inefficiently. Some of their clients are losing money directly. My client has lost about $860,000 trying to, again, all as an office of the court, trying to comply with this new rule. So Farm Worker Justice has its estimate. We have our estimate. But really the only estimate that counts is the one that the Department of Labor should have made using the methodology that it said was the correct methodology, and that's footnote 95 of the preamble. Your Honor, my time is up. Anything else to add, Your Honor? No, thank you. Thank you very much, sir. Ms. McTague. Good morning. Good to have you with us. Thank you. May it please the court, my name is Alexandra McTague, and I represent the government in this matter. I want to start briefly answering the questions about the procedural posture of the case. So there are different issues briefed on summary judgment, which is fully briefed below. After summary judgment was fully briefed, the plaintiffs made a motion to amend their complaint. That motion is pending. The government opposed it. So at this point, the operative complaint is still the complaint that was at issue for the preliminary injunction. But the summary judgment briefing addresses different issues, and they have moved to amend the complaint. So depending on what happens there, it could moot out this particular appeal. In the district court, you filed a motion, I believe, to dismiss for lack of standing. Do you still contend that these plaintiffs lack standing? We don't at this point, Your Honor. Now, I would actually like to start with the last two winter factors, which were not discussed at all. And the reason for that is that the plaintiffs have to establish all four winter factors separately. These last two factors, the balance of harms and the public interest, merge in a case against the government. But the district court found that the plaintiffs did not satisfy those factors, and that alone is a basis to affirm the district court's decision. And it made three findings with respect to these prongs. The first one related to the harm. So the district court found that the plaintiffs could be harmed by this final rule because they would be required to make payments under the rule that they wouldn't be able to recover. But the court found that there was equal harm to the workers if an injunction were entered because then they could miss out on payments that they would be entitled to under the final rule. And so the harm was two sides of the same coin. It didn't weigh in favor of the plaintiffs. And the plaintiffs don't seem to challenge that finding as clearly erroneous on appeal. What they say is, well, the farm workers may not be entitled to the payments. But that's a different question. That's a merits question. And the issue here is did the district court make an error in deciding that the harm did not weigh in favor of the plaintiffs because it affected both sides equally? And our answer is no. The district court was correct. He did not err in making that decision. The second issue on the last two factors was that an injunction could inject uncertainty into the H-2A program because the farmers wouldn't know exactly what workers should be paid under their contracts if an injunction were  And plaintiffs also don't seem to dispute that there would be uncertainty from an injunction. And so the question is, they say this court could provide certainty, but again, the question is, was the district court clearly erroneous in finding that there could be uncertainty injected by an injunction instead of letting this case proceed in the district court? And there's nothing clearly erroneous about that finding. And in terms of the public interest in enforcing a duly enacted statute, district court said there is a public interest in enforcing a statute. And that is what the final rule does. It enforces section 1188. And the district court found that in this particular context, when we're talking about immigration, it's something that implicates the government's sovereign interests. And so typically those statutes, there's a higher interest in enforcing statutes that implicate the government's sovereign interests. Now, the plaintiffs come back and say there is no interest in enforcing a rule that violates the APA. But at best, that gets them to a wash, that the factor doesn't weigh one way or the other. And so it was not clearly erroneous for the district court there to find that there's an interest in enforcing this particular statute. So the last two interfactors simply don't weigh in favor of the plaintiffs. That is what the district court found. That was not clearly erroneous. And this court can affirm on that basis alone. Unless there are any questions there, I will move on to the likelihood of success. So I'll start with illegal immigration. The plaintiffs are arguing that the final rule is arbitrary and capricious because DOL didn't consider how to control illegal immigration in setting its AWER, the A-E-W-R, AWER. So as an initial matter, we do not believe that that argument was really presented to the district court. We believe it was forfeited. And the reason for that is that when we were talking about the issues before the district court, it was a question of DOL's economic analysis. When DOL made the economic prediction that their rule in setting an AWER for this subset of farm workers would avoid adverse effects to the wages of U.S. workers similarly employed, that was their prediction. And the plaintiffs came back and said, well, it could increase the number of undocumented workers who are hired, and that would, in turn, decrease the wages of similarly employed U.S. workers. It would have an adverse effect. So it was couched in terms of what is the economic prediction that is going on here. And there was nothing arbitrary and capricious about how DOL made its economic predictions. Plaintiffs didn't argue, as they do on appeal, that as a statutory purpose, DOL was required to consider effects on controlling illegal immigration when setting its AWER. And as this court noted, the statutory text of Section 1188 does not mention illegal immigration. It sets forth two things DOL is supposed to consider. Well, let me ask you something, because on your exhaustion issue, the district court addressed the issue that's issued before us, JA 413, regarding the effect on illegal immigration and food supply. So, yes, but I would say that the district court addressed it in terms of the economic analysis, that it was not arbitrary and capricious for the Department of Labor to say that its AWER rule was going to prevent adverse effects, despite an argument made by the plaintiffs that the economic results of a higher AWER would be depressed wages. It was not this broad-brushed argument that any statutory purpose has to be considered in the rulemaking. And it's a nuance that has changed. I agree it's not, like, as clear as day, but it is an important nuance that we're talking about, because we were talking about the purposes of 1188 and the program, and this case law that talks about how the Department of Labor needs to balance the competing goals of an adequate labor supply and protecting the jobs of U.S. workers. And they do that primarily through this AWER to prevent adverse effects on the wages of U.S. workers. And so 1188 talks about two things. They have to certify that there aren't sufficient workers available, and that the hiring of the H-2A worker will not cause adverse effects to the wages or working conditions of U.S. workers similarly employed. It doesn't talk about illegal immigration. And I think here it's important to note that this adverse effects language was not new to the IRCA of 1986. It was in the original INA in 1952. And so if you look at plaintiffs' argument, their argument is, the statutory text about adverse effects meant one thing in 1952, and that same carryover language in the amendments of 1986 now means something different because of a statutory purpose. But in all of the case law that talks about DOL's authority to set the AWER under Section 1188, I'm not aware of a single case that says that DOL had to consider illegal immigration. And, in fact, if you look at the structure of the statute, we're talking about three titles, three main titles, and three purposes. Title I was about controlling illegal immigration, and it talked about doing that through employer sanctions and a verification system. It talked about the legacy INS and the immigration courts and that they were responsible for the enforcement activities. Title II was a pathway to legalization, so that's a separate purpose, legalization of undocumented individuals already in the United States in 1986. And then Title III was about the temporary worker program. So prior to 1986, there was one program called the H-2 program, and in 1986 they divided it into H-2A for agriculture, H-2B for other temporary workers. There's nothing in Title III. Can I turn you to the cost estimate issue? Absolutely. That issue causes, I think, there are a number of questions on that issue, and specifically I'd like you to address the question of what degree of and also, I guess to put it another way, how much incompleteness or inaccuracy in a cost estimate is really acceptable at this point? I don't think that Loeb or Bright is going to change the arbitrary and capricious analysis under State Farm. Loeb or Bright talks about how to best read a statute, and it overruled Chevron, so the agencies are no longer getting Chevron deference if there's ambiguity in the statute. It also talks about the idea that sometimes the best reading of the statute is one that delegates authority to the agency, that Congress makes those types of statutes all the time, and that in a lot of ways is what we're talking about with Section 1188 and DOL's setting of the AWER. They need to certify that there will not be adverse effects on the wages and working conditions of U.S. workers similarly employed, and the way in which they do that is what's been delegated under the statute. When it comes to the actual cost estimate, what we're talking about here is that it falls within the agency's expertise, and under the State Farm analysis and the arbitrary and capricious analysis, the agency has to consider the relevant factors, but they are given some level of deference for their expertise. And in this particular case, the district court credited the Department of Labor's explanation in the final rule that any reclassifications would be de minimis. And so what plaintiffs are really talking about here when they're talking about the cost of the final rule is that the majority of farm workers are going to fall under the prior rule and the Farm Labor Survey data, and you have this other section of farm workers who may be reclassified. Well, let me take that back. You have those who are farm workers. You have those who are clearly within the OEWS wages because, for example, they're heavy truck drivers or they're construction workers, and then you have this edge case of people who, in the labor certification, are described in a way that they may have duties that fall within the Farm Labor Survey codes, and they may have duties that cannot be put into the Farm Labor Survey codes. They fall into OEWS. And so in that case, they would be paid the higher wage. Is this the overlapping duties issue? It is. And that is the part of the cost estimate that plaintiffs take an issue with because they say that even though DOL found that the overlapping duties would be de minimis, based on its experience in labor certifications and how the rule would work, they're saying DOL still had to make that cost estimate that it wouldn't be de minimis. They disagree. They say it's not de minimis. And so what the district court found was DOL explained why it would be de minimis based on the broadness of the categories and the fact that farmers may just change how they design their jobs and labor certifications to avoid overlapping duties, and that as a result, DOL's cost analysis was reasonable and reasonably explained because it talked about how many applications definitely fall within the OEWS based on the two prior fiscal years. And these were all of the applications reviewed because your colleague says that DOL failed to review them. So it's a question of which data. There were over 25,000 labor certifications that were submitted in the prior two fiscal years. And so when it comes to the particular SOC code that was assigned to the job opportunity in the labor certification, that gets entered into a database. And those final SOC codes were reviewed because all of that information is readily extractable from the database to determine what the codes were. When it comes to whether some of the prior certifications would have been reclassified under the new rule, that analysis was not done because that would require going back to the written description of what the job opportunity was going to entail and then making a new analysis as to what SOC code would apply. And so it would require reanalyzing the underlying petitions as opposed to pulling the data directly from the database. Was your client under the obligation to do that and fail to do so? No, because the cost we're talking about, DOL determined, would be a de minimis cost because the farm labor survey categories are very broad. And so many of these, most H-2A workers are still going to fall under those categories under the farm labor survey, and their wages aren't going to change under the rule. And so there's no requirement that an agency has to come up with a perfect cost estimate or that it has to estimate every single minor issue that might come up under a cost estimate. The cost estimate that DOL did here was sufficient under the rule. It was reasonable, it was reasonably explained, and we do not believe it was arbitrary and capricious. So just to summarize, the government's position is that this court can affirm on the fact that the last two winter factors were not satisfied. But if this court is going to consider the merits arguments, the government does believe these were forfeited, that they really weren't presented to the district court. He didn't really have an opportunity to consider them. But even if the court is going to get to the ultimate merits on these issues, nothing that the Department of Labor did was arbitrary and capricious because there's nothing in the text of 1188 that requires it to consider controlling illegal immigration, and the cost analysis was sufficient. Thank you. Thank you very much, Ms. McTague. Mr. Hall? Thank you, Your Honor. I'd like to start with the obligation to consider financial cost and to do so in a manner that's reasonable and that is consistent with the Department of Labor's own expertise. Because what we have here is, and footnote 95, the Department of Labor tells us, this is not Wendell Hall saying it's not plaintiffs, it's not even government counsel, it's the Department of Labor's own experts saying, the only way that we're going to know what the cost of this rule is going to be is if we look at individual applications. And then that's what they say, it's not me. Number two, then, the Department of Labor sees this is the data. Here's a 25,150 application set of data. It's all electronic, can be searched easily if they wanted to do it. And then the department says, well, we're going to speculate because maybe it's going to be this many will be reclassified, maybe it'll be 2.91%, maybe it'll be 4%, maybe it'll be 30%, maybe it'll be 11%, we don't know, we're going to speculate. The Department of Labor takes this several times. Oh, this is de minimis. Well, that kind of excuse didn't work for this court in Azar. HHS says, oh, the physical separation is going to be de minimis. It's only going to be $30,000. But this court insisted on an explanation for that that was grounded in fact, that was grounded in studies, that was grounded in something more than the department say so. And that's what we have here. But the thing about it is the department's own say so is you needed to look at individual applications. I was sitting there listening to Ms. McTague describe briefs and arguments that I wrote, which I never did. We have never challenged directly a prediction of the Department of Labor. What we've said is that the Department of Labor hasn't used reasoned decision-making to come up with a prediction. The Department of Labor itself in footnote 95 tells us what it has to do. And yes, under State Farm, it has an obligation to review the relevant data. What it did here is it tipped over up to the relevant data, looked and said, no, thank you, we're not looking at it. That violates, it's not reasoned decision-making. That's not reasonably explained. We're just not going to do it because we think it will be really small. That didn't work in Azar, and I don't see any reason, I didn't hear any reason why it ought to work here. Let me hit the winner factors. We specifically argued those. We specifically argued them in our brief, and fundamentally... And you argued them to Judge Ridinger. Yes, exactly. I don't know why... That's right, and Judge Ridinger... Yeah, we lost. Ruled against you. Exactly. And he wrote an opinion, ruled against you. Explain why he was ruling against you. And he ruled against us because he didn't think we were going to provide...  I'm sorry, Your Honor. I say he's a pretty careful fellow. Well, even the best stumble sometimes. And fundamentally, what we have here is if it is illegal, there is no right to an elevated wage, so the workers are losing nothing they're entitled to. Obviously, it's wrong for the agency of the U.S. government to implement a rule that costs a lot of people a lot of money. Their estimate was $37.5 million a year. $375 million over 10 years. That's a lot of money. But yet, what do we get? Oh, it's de minimis. No. So, bottom... Let me focus before I move away from costs. Let me just summarize it. Number one, the department told us what method it needed to use to come to a rational estimate of cost. It told us what data it needed to look at to come to a rational estimate of cost, and it didn't. The department, and it's important to note, in this court's Sierra Club case, this court was well-nigh skeptical when it said that agencies can't run from accurate data. They can't complain, they can't get data. If they need data to make a rational decision, their job is to go get it. And if they're going to say, we don't have data, they need to show that it's impractical. And in Sierra Club, this court said, impractical means well-nigh impossible. Here, why not do a sample? This is the Department of Labor with the best statisticians in the country. Why not just pick 150 and come to a rational inference? They didn't do that. They didn't do the very thing that their own experts said they needed to do. And so what we have is, we don't know what the cost is. All we have is, trust me, I'm the government. But the fact that we have an APA says, we don't trust them because of the government. We review their reasoning, and we ask that they look at the right things with the right methodologies. So fundamentally, no, this is not an issue of predictions or anything like that. Did you follow the recipe? Did you do what you needed to do? Just a note that you're running out of time. Real quick, I want you to respond to, she's saying that you did not, the last two winter factors, which, of course, you know, I think it was the public interest and the harm. And she said there was harm to both sides. So it did not weigh in favor. First of all, the harm on both sides argument derives from this concept that the workers have a right to a particular level of adverse effect wage rate. And I'm not talking people who have already worked according to a contract. I mean, prospectively, there is a right. So therefore, if the adverse effect wage rate isn't raised, they've lost something. That's just not true. There's no right to an elevated wage rate. In fact, the purpose of the adverse effect wage rate is to protect the market, not to provide a certain level of minimum wage to age 2 workers. So the essence, this concept that a worker has a right to a certain level of wage is simply inconsistent. And may I make one more point in response to the question? I don't want to... Go ahead. Thank you, Your Honor. I am very gratified that the department is very concerned about the uncertainty of what happens if this is enjoined. It's very simple. We go back to the FLS. If amici are correct, and if the department's correct on their 2.91% estimate, that's not a lot of uncertainty. And that's not uncertain at all. I could look up every A-word in 30 seconds in the Federal Register. So thank you for your attention, and we ask that the district court's decision denying the preliminary injunction be reversed. Thank you. Thank you, Mr. Hall. The matter will be taken under advisement. Judge Benjamin and I will come down and re-counsel, and we'll take a short break. This honorable court will take a brief recess.
judges: Robert B. King, DeAndrea Gist Benjamin, Nicole G. Berner